**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JONICE SAPP,

      Petitioner,

                                   Case No. 1:26-cv-22395-KMM

v.

PJ CHEESE, INC.,

      Respondent.

_____/

## PJ CHEESE'S RESPONSE IN OPPOSITION TO SAPP'S MOTION TO CONFIRM ARBITRATION AWARD

Respondent/Counter-Petitioner, PJ Cheese, Inc. ("PJ Cheese"), respectfully files this Response in opposition to Petitioner/Counter-Respondent's, Jonice Sapp, Motion to Confirm ("Motion") the Final Arbitration Award ("Arbitration Award") and, as grounds, states as follows:

## INTRODUCTION

Arbitration is a matter of consent, not coercion. Under no interpretation of the parties' Arbitration Agreement did PJ Cheese agree to give an arbitrator the authority to grant a remedy not allowable in any court of law, to wit, a tax refund, or permit a mass arbitration proceeding.

PJ Cheese is a pizza company, not a federal agency authorized to administer tax refunds. The refund of allegedly erroneously collected internal revenue taxes is a remedy that may only be recovered from the Internal Revenue Service (or on appeal therefrom), not from a private, non-governmental actor, like PJ Cheese. The Arbitrator exceeded the authority granted to her under the parties' Arbitration Agreement by granting a remedy prohibited by federal statute and clear Supreme Court precedent. The parties' Arbitration Agreement, which included the terms of a Dispute Resolution Program, limited her authority to adjudicating legal claims and awarding remedies allowed by law and available through a court of law. There was no arguable basis for

1

construing the Arbitration Agreement as allowing a remedy that was prohibited by law and comported only with the Arbitrator's own sense of justice.

In addition, the parties did not contractually agree to apply the Mass Arbitration Supplementary Rules to their arbitration. Like class arbitration, mass arbitration significantly changes the nature of arbitration, and, therefore, under Supreme Court case law, the parties cannot be compelled to mass arbitration absent a contractual basis for concluding that they agreed to it. The Process Arbitrator exceeded his alleged authority by compelling the parties to mass arbitration without even arguably interpreting the parties' agreement as permitting mass arbitration.

Accordingly, for these reasons and as further discussed below, PJ Cheese respectfully requests that this Court deny Sapp's Motion to Confirm and instead grant PJ Cheese's separate Motion to Vacate and vacate the Arbitration Award under section 10(a)(4) of the FAA.

## BACKGROUND

PJ Cheese is a large franchise of Papa John's, known for its fresh, never-frozen original dough, high-quality ingredients, and signature garlic sauce; it operates locations throughout multiple states, including Florida. The company emphasizes its commitment to quality and community involvement through various initiatives, including fundraising efforts. As part of its successful operation, PJ Cheese employs thousands of employees across its restaurants, including pizza delivery drivers. As an employer, PJ Cheese is responsible for withholding and collecting federal internal revenue taxes from its employees and paying those funds to the federal government. This dispute is based upon PJ Cheese's collection of those taxes from Jonice Sapp, a former pizza delivery driver.

Like most PJ Cheese employees, Sapp signed an Arbitration Agreement when she worked for the company. The Arbitration Agreement, which included the terms of a Dispute Resolution

Program ("DRP"), limited the scope of disputes to statutory or common law claims, directed the arbitrator to apply substantive laws and the law of remedies, and provided that the arbitrator could grant relief to the extent available through a court of law. The Arbitration Agreement stated the goal of arbitration was "quick problem resolution" and included no express mention of mass arbitration proceedings. The DRP and Arbitration Agreement are attached as Exhibit "A."

After PJ Cheese withheld federal internal revenue taxes in the amount of $1,330.85[1] from Sapp's vehicle reimbursements, on September 11, 2024, Sapp filed a demand for arbitration with the American Arbitration Association ("AAA"), seeking recoupment of the taxes from PJ Cheese under the guise of unpaid wages claims. Sapp brought claims for violation of the Fair Labor Standards Act, 29 U.S.C. § 206, a provision of the Florida Constitution, Fla. Const. Art. X § 24, and the Florida Minimum Wage Act, section 448.110 of the Florida Statutes. The Demand for Arbitration is attached hereto as Exhibit "B."

After the demand was filed, the arbitration proceedings stalled for months while the AAA delayed so that a sufficient number of similar demands could accumulate. Then, the AAA made a determination to apply the Mass Arbitration Supplementary Rules, opened a mass arbitration case, which was styled as *117 Individual Claimants v. PJ Cheese, Inc.; PJ Louisiana, LLC; PJ Chippewa, LLC; PJ Utah, LLC and Ohio Pizza Delivery Co.*, Case No. 01-24-00006-4854 ("Mass Arbitration" or "Mass Arbitration Case"), and appointed a "Process Arbitrator," William H. Lemons, to oversee the claims. The AAA concluded that the Mass Arbitration Supplementary Rules apply notwithstanding a November 11, 2024, email from Tacy Zysk, Assistant Vice President of the AAA, in which the AAA acknowledged that the parties agreed the AAA's Mass

---

[1] In response to Sapp's Florida pre-suit notice letter, PJ Cheese reimbursed Sapp $3,456.26, which reflected **all** the vehicle reimbursements she requested, minus a deduction in the amount of $1,330.85 for "Federal Tax," "FICA Social Security Tax," and "FICA Medicare Tax."

Arbitration Supplementary Rules (and thus fees) do not apply, as follows:

> At the commencement of the Zoom conference call with Process Administrator on November 8, 2024, the parties informed Arbitrator Lemons that they jointly agreed that the AAA Mass Arbitration Supplementary Rules **do not** apply to these 115 disputes.

A copy of the November 11, 2024, email is attached hereto as Exhibit "C" (emphasis added).

Upon PJ Cheese's objection to the mass arbitration proceeding, on November 22, 2024, Lemons issued an order determining that the Mass Arbitration Supplementary Rules applied to the claims. The order is attached hereto as Exhibit "D." In the order, Lemons reasoned that the Mass Arbitration Supplementary Rules were automatically "placed in play" by the AAA Employment Arbitration Rules incorporated into the parties' agreement. Although Lemon alluded to "the language of the DRP" in his order, Lemons did not actually or arguably construe the language of the program as authorizing mass arbitration proceedings. Instead, Lemons explained that parties cannot exclude application of the Mass Arbitration Supplementary Rules if they agree to apply the AAA Employment Arbitration Rules, simply stating:

> To make the MA rules inapplicable, the individual employee and an appropriate company official would need to modify the Arbitration Agreement and the applicable DRP to provide that rules other than the AAA Employment Arbitration Rules would apply.

MA Order at 2 n.2.

"Notwithstanding Lemons' ruling, PJ Cheese sought for months to proceed with individual claimant arbitrator selection so the individual claims could proceed but was forestalled." 2/25 correspondence from W. Hancock regarding *Individual Claimants v. PJ Cheese, Inc.*, which is attached hereto as Exhibit "E." In addition, PJ Cheese repeatedly argued before the AAA that "no private arbitrator has the legal authority adjudicate any [of] Respondent's tax withholding obligations." *Id.* Meanwhile, the mass arbitration proceeding generated months of delay

4

associated with a time-consuming global mediation, appointment of a second Process Arbitrator, Carol E. Heckman, and motion practice before Heckman.[2]

Eventually, the AAA appointed Merits Arbitrator Mary Barzee Flores, and, on October 19, 2025, Barzee issued her Order Denying PJ's Cheese Motion for Summary Judgment ("Summary Judgment Order" or "SJ Order").  The Summary Judgment Order is attached hereto as Exhibit "G."

In the Summary Judgment Order, Barzee concluded that PJ Cheese improperly withheld taxes and that Sapp was entitled to an award of damages in the amount of the tax withholdings.  SJ Order at 7.  In granting a refund of internal revenue taxes, the Arbitrator did not purport to apply any applicable law or the parties' DRP, instead stating her views as follows:

> Green[3] rejected PJ Cheese's arguments about . . . the Claimant being free to pursue the withheld tax payments from government taxing agencies, and non-arbitrability of the disputed payment.  I reject these arguments as well.

SJ Order at 6.

On March 25, 2026, a full year and a half after the Demand for Arbitration was filed on September 11, 2024, Barzee issued the Final Award ("Final Award").  The Final Award is attached

---

[2] As a result of the proceedings before the second Process Arbitrator, Heckman issued "Process Arbitrator Order No. 2," in which she ruled on, among other issues, the enforceability of a provision in the DRP.  The DRP provides that the arbitration "will be before a neutral arbitrator who is licensed to practice law Alabama [sic]."  DRP at 8.  Despite the express terms of the DRP, claimants in the Mass Arbitration Case argued that drivers, such as Sapp, who do not work or reside in Alabama, should not be required to arbitrate before an Alabama-licensed attorney. Heckman agreed with the claimants and held that the provision was "not workable as a practical matter given the limited size of the pool."  In addition, Heckman ordered PJ Cheese to pay AAA fees (of $325 per case and arbitrator selection fees of $1,100 per case) for each of the cases (except for those prepaid by claimants). The Process Arbitrator Order No. 2 is attached hereto as Exhibit "F."

[3] Melvia B. Green issued a final award in the arbitration case filed by Ali Sarwi against PJ Cheese, which is attached to Sapp's motion to confirm as Exhibit 19 (DE 12-19).  There was no mention in Green's final award of the propriety of awarding a refund of tax withholdings.

hereto as Exhibit "H."  In the Final Award, Barzee incorporated her Summary Judgment Order, which is attached as Exhibit "G," along with an Order Granting Claimant's Motion for Summary Judgment on Actual and Liquidated Damages.  In addition to the tax refund,[4] and all as a consequence of granting the tax refund, the Arbitrator granted liquidated damages of $1,443.84, prevailing-party attorneys' fees of $39,647.50, and prevailing-party costs of $2,021.75.[5]

In all, the Arbitrator awarded approximately $44,179.54 to Sapp or Sapp's counsel and against PJ Cheese because PJ Cheese withheld and collected approximately $1,066.45 of internal revenue taxes from Sapp and paid those funds to the federal government.

### STANDARD OF REVIEW

Sapp's explanation of the standard of review on page nine of the Motion to Confirm is not applicable here because PJ Cheese is not arguing that the Arbitrator committed an error of law and the Arbitrator's imposition of a tax refund was tantamount to an amendment of the parties' agreement rather than an arguable interpretation of it.  The Court of Appeals for the Eleventh Circuit has held, on numerous occasions, that an arbitrator exceeds his or her powers under section 10(a)(4) of the FAA when he or she grants a remedy that the agreement does not allow.  *See, e.g.*, *Interstate Brands Corp. v. Loc. 441 Retail, Wholesale & Dep't Store Union, AFL-CIO*, 39 F.3d 1159, 1162 (11th Cir. 1994) (reversing order confirming arbitration award and finding that the "the arbitrator went beyond the collective bargaining agreement [when he] undertook to interpret the

---

[4] In the Final Award, the Arbitrator awarded a refund of $1,066.45 in tax withholdings, representing the "Federal Tax" portion of the internal revenue taxes that were withheld; the award did not include a refund of the FICA Social Security Tax or FICA Medicare Tax withholdings.

[5] Contrary to the allegations of the Petition, the Arbitrator did not include the amount of her compensation in the Final Award, and therefore Sapp's request for a final judgment on liability for $43,940.00 in arbitrator's fees is improper.  For the same reason, Sapp's request to hold PJ Cheese liable to the AAA in the amount of $1,365.00 is improper as that amount is not part of the Final Award.

DOT regulations"); *Warrior & Gulf Nav. Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 996 F.2d 279, 279 (11th Cir. 1993) (affirming order vacating arbitration award where the "arbitrator's remedy contradicted the express language of the [a]greement"); *Bruno's, Inc. v. United Food & Com. Workers Int'l Union, Loc. 1657*, 858 F.2d 1529, 1531 (11th Cir. 1988) (affirming vacatur of arbitration award where the arbitrator lacked the authority to grant the relief awarded); *Butterkrust Bakeries v. Bakery, Confectionery & Tobacco Workers Int'l Union, AFL-CIO, Loc. No. 361*, 726 F.2d 698, 700 (11th Cir. 1984) (affirming vacatur of arbitration award where arbitrator exceeded his authority by granting remedy he had no power to grant).  "Although there is a liberal federal policy favoring arbitration . . . , this policy does not override the wishes of parties who have restricted the circumstances under which they agree to arbitrate disputes." *Ehlen Floor Covering, Inc. v. Lamb,* 660 F.3d 1283, 1288 (11th Cir. 2011) (internal citations omitted) (affirming district court's order denying motion to compel arbitration where the parties' dispute fell outside the scope of the parties' arbitration agreement).  An arbitrator "does not have unfettered discretion.  He [or she] may not impose a remedy which directly contradicts the express language of the . . . [parties' arbitration] agreement." *Bruno's*, 858 F.2d at 1531.

The Arbitrator also exceeded her authority under section 10(a)(4) of the FAA by imposing arbitration procedures based upon her own policy judgments.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684-87 (2010).  Under Supreme Court precedent, when an arbitrator's imposition of special procedures significantly changes the nature of bilateral arbitration, a party, such as PJ Cheese, may not be compelled under the FAA to submit to those procedures unless "there is a contractual basis for concluding that the party agreed to [those procedures]." *Id.* at 684-85.  A court may vacate an arbitral award under section 10(a)(4) when the arbitrator, like Barzee, fails to even arguably interpret the parties' contract.  *Oxford Health Plans LLC v. Sutter*, 569 U.S.

564, 569, 571 (2013).  An arbitration panel exceeds its authority when "instead of identifying and applying a rule of decision derived from the FAA or [applicable] law, the arbitration panel impose[s] its own policy choice and thus exceed[s] its powers."  *Stolt-Nielsen*, 559 U.S. at 676-77 (finding arbitration panel exceeded its powers by applying its own brand of policy).

## ARGUMENT

Contrary to Sapp's suggestion otherwise in the Motion to Confirm, there is no indication that the Arbitrator interpreted the text of the DRP in deciding to arbitrate Sapp's claim, and the Arbitrator failed to find any contractual basis for permitting mass arbitration.  Moreover, the DRP is not open to interpretation as to the arbitrability of a claim for a tax refund as the DRP does not permit a remedy that it is not recoverable in a court of law and an award of a tax refund is not recoverable in any court of law; further, the DRP fails to provide any contractual basis for imposition of mass arbitration procedures.  Therefore, the Arbitrator acted beyond her authority when she arbitrated a tax refund claim and permitted the mass arbitration procedures to stand.

I.    **The Arbitrator Did Not Even Arguably Interpret the DRP in Deciding that the Parties' Dispute Was Arbitrable, and Imposition of a Tax Remedy Was Precluded by its Terms**.

Sapp contends that the Arbitrator "considered and interpreted" the parties' agreement in deciding that Sapp's claim was arbitrable.  Mot. at 11.  That is false.  Tellingly, Sapp does not cite to any specific portions of the Arbitration Award in which the Arbitrator allegedly considered and interpreted the text of the DRP.  Mot. at 11.  In actuality, the Arbitrator failed to indicate anywhere in the Arbitration Award that she considered and interpreted the DRP in deciding that Sapp's claim was arbitrable.  Rather than recounting the text of the DRP, the Arbitrator simply cited another arbitrator's ruling:

8

> Green rejected PJ Cheese's arguments about . . . the Claimant being free to pursue the withheld tax payments from government taxing agencies, and non-arbitrability of the disputed payment.  I reject these arguments as well.

SJ Order at 6.  Because the Arbitrator did not even arguably interpret the parties' DRP, this Court should vacate the Arbitration Award under section 10(a)(4) on that basis alone.  *Oxford Health*, 569 U.S. at 564, 569, 571.

Notably, Sapp's misguided focus on whether the Arbitrator "arguably held" that her wage claims are arbitrable misses the mark by a wide margin.  Mot. at 12.  The issue under *Oxford Health* is whether the Arbitrator arguably ***interpreted*** the DRP as allowing arbitration of Sapp's claim (not whether she "arguably held" that her claims were arbitrable), 569 U.S. at 569, 571, and the claim in question is truly a claim for a tax refund, not a minimum wage claim, *Ednacot v. Mesa Med. Grp., PLLC*, 790 F.3d 636, 639-40 (6th Cir. 2015); *Berera v. Mesa Med. Grp., PLLC*, 779 F.3d 352, 357–63 (6th Cir. 2015).  Sapp's claim is, first and foremost, a claim that taxes have been erroneously assessed and should be refunded to Sapp.  Under any construction of the Arbitration Award, the Arbitrator failed to consider and interpret the DRP to determine whether Sapp's claim for a tax refund was arbitrable.  Moreover, there is no basis in the Arbitration Award for presuming that the Arbitrator arguably interpreted the language of the DRP as allowing arbitration of Sapp's tax refund claim.  As mentioned above, the Arbitrator specifically based her decision on another arbitrator's ruling, not on the language of the DRP.  SJ Order at 6.

Further, the Arbitrator could not have inferred her authority to arbitrate a tax refund claim because the DRP precludes that remedy.  *Butterkrust Bakeries*, 726 F.2d at 700 (affirming vacatur of arbitration award where arbitrator exceeded his authority by granting remedy he had no power to grant).  Under the DRP, the Arbitrator is only authorized to act on a claim to the extent that the relief sought is awardable in a court of law.  *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d

1054, 1058 (11th Cir. 1998) (finding that statutory claim was not subject to arbitration where agreement limited the remedies available and those remedies did not include statutory remedies). Because the DRP limits the remedies available to those awardable in court and 26 U.S.C. § 7422(a) prohibits the recovery of tax refunds in court, the language of the DRP does not support an interpretation that grants the Arbitrator the authority to arbitrate claims for the recovery of tax refunds. The Arbitrator effectively amended the DRP rather than interpreting it. Because the Arbitrator exceeded her authority by granting a remedy she had no power to grant, vacatur of Arbitration Award is warranted. *Butterkrust Bakeries*, 726 F.2d at 700.

Specifically, in the tax arena, "26 U.S.C. § 7422(a) states that '*[n]o suit* ... shall be maintained in *any court* for the recovery of *any internal revenue tax* alleged to have been erroneously or illegally assessed or collected, or of *any penalty* claimed to have been collected without authority, or of *any sum* alleged to have been excessive or *in any manner* wrongfully collected, until a claim for refund ... has been duly filed with' the IRS." *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 7 (2008) (quoting 26 U.S.C. § 7422) (emphasis in original). Commenting on the sweeping breadth of the statute, the Supreme Court in *Clintwood* observed that "[f]ive 'any's' in one sentence and it begins to seem that Congress meant the statute to have expansive reach." *Id.* Given the "broad sweep" of section 7422(a), the Supreme Court explained that "claims are barred *whatever the source of the cause of action*." *Id.* at 9 (emphasis added). For example, in *Clintwood,* the Supreme Court held that a claim that sought a refund of taxes based upon an asserted violation of the U.S. Constitution was barred under section 7422(a). *Id.* The Supreme Court reasoned that "it is certainly within Congress's authority to ensure that allegations of taxes unlawfully assessed—whether the asserted illegality is based upon the Export Clause or *any other provision of law*—are processed in an orderly and timely manner, and that costly

10

litigation is avoided when possible." *Id.* at 12 (emphasis added).  In addition, emphasizing the clarity of the statute, the Supreme Court opined, "we cannot imagine what language could more clearly state that taxpayers seeking refunds of unlawfully assessed taxes must comply with the Code's refund scheme before bringing suit." *Id.* at 8.

In the specific context of unpaid wages claims, section 7422(a) prohibits an employee's recovery of income taxes from his or her employer. *Ednacot v. Mesa Med. Grp., PLLC*, 790 F.3d 636, 639-40 (6th Cir. 2015); *Berera v. Mesa Med. Grp., PLLC*, 779 F.3d 352, 357–63 (6th Cir. 2015).  In *Berera*, the appellate court affirmed the dismissal of an employee's unpaid wages claim under section 7422.  779 F.3d at 363.  First, characterizing the plaintiff's claims, the court found that the employee's "purported state-law wage claims [we]re truly a [tax] refund claim," reasoning that "the forced payment of payroll taxes [wa]s the factual foundation of Berera's purported state-law claims." *Id.* at 358.  Second, relying upon the "plain language" of section 7422 and the Supreme Court's holding in *Clintwood*, the court found that because "[t]he essence of Berera's allegations is that Mesa wrongfully collected its FICA tax from her[,] . . . § 7422(a) bars such a claim where, as here, the taxpayer fail[ed] to first file a refund claim with the IRS." *Id.* at 360.[6] Thus, based upon *Berera* and *Ednacot*, section 7422 bars Sapp's purported wage claim, which is truly a claim for a tax refund, because she failed to file a refund claim with the IRS.

---

[6] In addition to the section 7422(a) statutory bar, under 26 U.S.C. § 3403, courts have uniformly held that "[e]mployees have no cause of action against employers to recover wages withheld and paid over to the government in satisfaction of federal income tax liability." *Edgar v. Inland Steel Co.*, 744 F.2d 1276, 1278 (7th Cir. 1984) (citing cases); *Plazzi v. FedEx Ground Package System, Inc.*, 52 F.4th 1, 5 (1st Cir. 2022) ("[F]ederal . . . law[] shield employers from liability to nongovernmental actors for nonpayment of wages withheld for taxes."); *Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766, 770 (9th Cir.1986) ("[S]uits by employees against employers for tax withheld are 'statutorily barred.'").  Pursuant to 26 U.S.C. § 3403, "[t]he employer shall be liable for the payment of the tax required to be deducted and withheld under this chapter, and shall not be liable to any person for the amount of any such payment."  26 U.S.C. § 3403.

Further, contrary to Sapp's contention otherwise, none the three cases cited by Sapp supports her position that her arbitration claim is exempt from the section 7422 bar.  Mot. at 19. While Sapp purports to assert a minimum wage violation, the alleged violation directly arises out of PJ Cheese's withholding of taxes.  Sapp challenges PJ Cheese's withholding of taxes from her vehicle reimbursements.  Sapp has not identified any "completely distinct allegedly unlawful conduct" on the part of the employer that does "not arise out of the [employer's] collection of taxes."  *Childers IV v. New York and Presbyterian Hosp.*, 36 F. Supp. 3d 292, 303–04 (S.D.N.Y. 2014); *Reuss v. Orlando Health, Inc.*, 140 F. Supp. 3d 1299, 1310 (M.D. Fla. 2015) ("[T]he Hospital's conduct is not separate or distinct from the Hospital's role as a collecting agent on behalf of the IRS.").

First, *Davidson* is not analogous here as Sapp is not challenging any kind of independent administrative decision that increased Sapp's tax liability.  In *Davidson*, a company and its retirement plan failed to withhold FICA taxes at retirement pursuant to a special regulatory timing rule.  *Davidson v. Henkel Corp.*, No. 12-cv-14103, 2015 WL 74257, at *1-2 (E.D. Mich. Jan. 6, 2015).  As a result of that mistake, the retiree could not benefit from a non-duplication regulation and was liable for higher taxes, prompting him to sue his employer and the plan under ERISA.  *Id.* In confirming that the action was not foreclosed by section 7422, the court referred to the reasoning it supplied in its earlier opinion, namely, that the retiree was "'not challenging [d]efendants' withholding of FICA taxes, rather he [wa]s challenging their failure to follow the special timing rule resulting in a reduction to his benefits.'"  *Id.* at *4 (quoting *David v. Henkel Corp.*, No. 12-cv-14103, 2013 WL 3863981, at *5 (E.D. Mich. July 24, 2013)).  The court further explained that the case was "not about taxes, but [wa]s instead about [d]efendants' administration of the plan." *Id.* at *3.

Unlike the retiree in *Davidson*, whose claims arose out of the defendants' timing mistake, Sapp is not challenging the timing aspects of PJ Cheese's withholding decision or any other administrative mistake that increased the amount of the tax withholdings. Rather, Sapp is arguing that PJ Cheese erroneously withheld taxes from her vehicle reimbursements.

Second, *Childers IV* is not applicable because PJ Cheese has not entered into any kind of agreement or release that has increased Sapp's tax liability. In *Childers IV*, a hospital entered into a confidential agreement with the IRS to settle a tax dispute unrelated to the FICA taxes at issue, but as part of the agreement the hospital gave up its right to seek refunds for the employee portions of the FICA taxes paid on behalf of its medical residents. *Childers IV,* 36 F. Supp. 3d at 300. As a result of the settlement, the residents were ineligible to receive the tax refunds and sued the hospital alleging tortious conduct. *Id.* In concluding that the action was not foreclosed by section 7422, the court reasoned that the hospital's liability "d[id] not arise out of the [employer's] collection of taxes" but instead arose out of "completely distinct allegedly unlawful conduct." *Id.* at 303–04. In other words, the medical residents were suing the hospital for its independent action in entering into the settlement agreement, not for its actions as a tax collector. *Id.*

Unlike the medical residents in *Childers IV*, who challenged the employer's decision to enter into a settlement agreement and release their right to claim a refund from the IRS, Sapp is not claiming that PJ Cheese contracted away her right to a refund. Quite the contrary, PJ Cheese has adamantly argued throughout the arbitration proceedings that Sapp's proper recourse is to pursue a refund from the IRS.

Third, *Cattau* is not availing as Sapp has not claimed that PJ Cheese made an independent mistake that increased her tax liability but instead alleges that PJ Cheese erroneously withheld taxes from her vehicle reimbursements. In *Cattau*, a school district and a retirement company

represented to prospective early retirees that certain stipends payable over ten years qualified for income tax deferments and were exempt from FICA taxes. *Cattau v. Nat'l Ins. Servs. of Wisconsin, Inc.*, 865 N.W.2d 215, 218 (Wis Ct. App. 2015). However, the defendants failed to structure the plan properly under the regulations (because the payment term exceeded the maximum allowable term) and, as a result, the stipends did not qualify for special tax treatment and the retirees became liable for immediate tax liability, and a lawsuit ensued. *Id.* In concluding that the action was not foreclosed by section 7422, the court reasoned that the retirees "d[id] not make any allegations that the IRS imposed any erroneous or illegal tax" but instead "alleged mistakes in administering the retirement plan with a payment period that was not in compliance with the maximum period allowed for a 403(b) plan by the IRS caused damages to the [r]etirees." *Id.* at 219-20. Unlike the early retirees in *Cattau*, who were not challenging their tax liability, Sapp has repeatedly alleged that PJ Cheese erroneously withheld taxes from her vehicle reimbursements.

Furthermore, Sapp's emphasis that in her pre-suit notice, she originally sought vehicle reimbursements, not a tax refund, misses the point. PJ Cheese paid the vehicle reimbursements that Sapp requested in her pre-suit notice less tax withholdings. As a result, Sapp's claim in arbitration was entirely different than her claim in the pre-suit notice. In arbitration, Sapp claimed that PJ Cheese erroneously withheld taxes and that by withholding taxes PJ Cheese violated Florida minimum wage laws. Sapp's alleged minimum wage claim in arbitration, therefore, arose out of PJ Cheese's collection of taxes. The tax issue arose because PJ Cheese paid the vehicle reimbursements that Sapp requested, not because PJ Cheese refused to pay them or committed some independent wrongful act first. Sapp cannot point to any independent conduct on the part of PJ Cheese to claim exemption from the section 7422 bar. Because section 7422 bars Sapp's

14

recovery of a refund of tax withholdings, and the DRP prohibits the recovery of any remedy not recoverable in court, the Arbitrator was precluded from imposing a tax refund.

**II.    The Arbitrator Did Not Arguably Interpret the DRP in Deciding that the Parties Agreed to Submit to Mass Arbitration Procedures.**

**A.    Supreme Court Precedent Has Established that Arbitrators May Not Infer Consent to Permit Class Arbitration Absent an Affirmative Contractual Basis Due to the Nature of Arbitration.**

In *Stolt-Nielsen*, the Supreme Court held that an arbitration panel exceeded its authority under section 10(a)(4) of the FAA by imposing class procedures based upon policy judgments rather than a basis in the arbitration agreement itself.  559 U.S. at 684-87.  The court ruled that because class arbitration significantly changes the nature of bilateral arbitration, "a party may not be compelled under the FAA to submit to class arbitration unless ***there is a contractual basis for concluding that the party agreed to do so***."  *Id.* at 684-85 (emphasis added).  In that case, the court determined that the agreement at issue, which was stipulated by the parties to be silent on the question of class arbitration, could not provide the contractual basis required to allow class arbitration.  *Id.* at 687 (reversing the decision of the court of appeals which had reversed the district court's order vacating the award that compelled class arbitration).  The court reasoned that parties generally favor arbitration due to the economics offered by bilateral dispute resolution.  *Id.* at 685.  Drawing upon the observations of four other Supreme Court cases, the *Stolt-Nielsen* court explained the benefits of private arbitration, as follows:

> In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed , and the ability to choose expert adjudicators.

*Id.*  These differences between private arbitration and class arbitration give "reason to doubt the parties' mutual consent to resolve disputes through classwide arbitration.  *Id.* at 685-86.

15

Expounding upon the necessity of a contractual basis, in *Oxford Health*, 569 U.S. at 569, the Supreme Court further ruled that where the arbitrator fails to even arguably interpret the parties' contract, or essentially "abandons their interpretive role," in determining that the parties agreed to permit class arbitration, the court may vacate the arbitral award under section 10(a)(4). *Id.* at 571.

In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011), the Supreme Court held that a California rule that conditioned the enforceability of arbitration agreements on the availability of classwide procedures was prohibited and preempted by the FAA. The *Concepcion* court highlighted that the "two goals of the FAA are "enforcement of private agreements to arbitrate" and "encouragement of efficient and speedy dispute resolution." *Id.* at 345 (citation and internal quotation marks omitted). The *Concepcion* court then explained that class arbitration would sacrifice the principal benefits of arbitration, as follows:

> [T]he switch from bilateral to class arbitration sacrifices the ***principal*** advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment.

*Id.* at 348 (emphasis added).

In *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 509 (2018), the Supreme Court held that class action waiver clauses in arbitration agreements are not illegal. The Court reasoned, in part, that if parties were able to demand classwide arbitration, "the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness, would be shorn away and arbitration would wind up looking like the litigation it was meant to displace." *Id.*

In *Lamps Plus*, the Supreme Court further held that a finding of ambiguity in an arbitration agreement does not provide the required contractual basis to find that the parties agreed to permit

class arbitration.  587 U.S. at 183.[7]  In discussing the importance of consent under the FAA and

deciding that ambiguity does not provide a contractual basis to conclude that parties agreed to

classwide arbitration, the Supreme Court recounted its jurisprudence on the principal advantage of

bilateral arbitration, as follows:

> In carrying out that responsibility, it is important to recognize the "fundamental" difference between class arbitration and the individualized form of arbitration envisioned by the FAA. *Epic Systems*, 584 U.S., at ——, 138 S.Ct., at 1622–1623; *see also Concepcion*, 563 U.S. at 349, 351, 131 S.Ct. 1740; *Stolt-Nielsen*, 559 U.S. at 686–687, 130 S.Ct. 1758. In individual arbitration, "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Id.*, at 685, 130 S.Ct. 1758. Class arbitration lacks those benefits. It "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Concepcion*, 563 U.S. at 348, 131 S.Ct. 1740. Indeed, we recognized just last Term that with class arbitration "the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness, would be shorn away and arbitration would wind up looking like the litigation it was meant to displace." *Epic Systems*, 584 U.S., at ——, 138 S.Ct., at 1623.
> . . .
> Our reasoning in *Stolt-Nielsen* controls the question we face today. Like silence, ambiguity does not provide a sufficient basis to conclude that parties to an arbitration agreement agreed to "sacrifice[ ] the principal advantage of arbitration." *Concepcion*, 563 U.S. at 348, 131 S.Ct. 1740.

*Id.* at 184-85.  Like the Supreme Court, the Court of Appeals for the Eleventh Circuit has echoed

the purpose of arbitration as achieving a speedy resolution.  *Merritt Island Woodwerx, LLC v.*

*Space Coast Credit Union*, 137 F.4th 1268, 1276 (11th Cir. 2025) (citations omitted).

    **B.**      <u>**Mass Arbitration Sacrifices the Informality of Arbitration and Makes the Process Slower and More Costly.**</u>

---

[7] In so holding, the Supreme Court rejected a dissenting judge's contrary opinion that the parties' mere incorporation of the AAA rules for employment disputes, "which furnish rules for arbitrators to conduct class proceedings" "support[ed] reading it to authorize class authorization."  587 U.S. at 207 (Kagan, J., dissenting).

Like class-action arbitration, mass arbitration fundamentally "changes the nature of arbitration." *Stolt-Nielsen*, 559 U.S. at 685. The parties in a mass arbitration do not realize the hallmarks of arbitration: "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Id.*

In a mass arbitration, the parties do not directly proceed to the selection of an arbitrator who resolves the merits of their dispute. Instead, the parties are compelled to participate first in a pre-arbitration phase before a "Process Arbitrator," which slows the arbitration process, and there is no opt-out option. As part of this preliminary phase, the Process Administrator coordinates and resolves a variety of enumerated issues and any other issue that "the Process Arbitrator determines is appropriate for determination."[8] MA-6(c). Unlike an arbitrator chosen according to an agreed upon procedure, the Process Arbitrator is appointed by the AAA in "its sole discretion" without the participation of the parties. MA-6(a) ("[T]he AAA-ICDR may, in its sole discretion, appoint a Process Administrator").[9] The appointment of Merits Arbitrators is governed by MA-7, which establishes a selection process. MA-7. The Rules also provide for the scheduling of Preliminary Management Conferences and hearings, sounding more like litigation than arbitration. MA-8.

In terms of the delay associated with mass arbitration, after Sapp first filed an arbitration claim on September 11, 2024, a period of one and a half months transpired before any action was taken in the case. During this time, the AAA delayed until the cases accumulated and a Process Arbitrator could be appointed to oversee the claims against PJ Cheese and its affiliates as the parties waited. Meanwhile, PJ Cheese "sought for months to proceed with individual claimant

---

[8] In this case, the Process Arbitrators purported to resolve, among other issues, the enforceability of certain provisions in the claimants' Arbitration Agreements and the applicability of the Mass Arbitration Supplementary Rules themselves, even though the parties had vested the decision-making authority on those issues in a merits arbitrator of the parties' own choosing.
[9] Neither of the two Process Arbitrators appointed by the AAA were chosen by the parties.

arbitrator selection so the individual claims [could] proceed but ha[d] been forestalled." Ex. E. Adding to the delay, a time-consuming global mediation necessarily halted the proceedings; further, the parties briefed and argued claimants' motion regarding Alabama-licensed arbitrators and a sanctions motion, leading to additional delay. In total, the time associated with the mass arbitration exceeded the time it took, from appointment to disposition, for the actual merits phase of the arbitration. The Demand for Arbitration was filed on September 11, 2024, but the Merits Arbitrator was not appointed until a year later, and the Final Award was issued on March 25, 2026. In addition, the Mass Arbitration deprived the parties of their participation in the selection of a decisionmaker, here Process Arbitrator Heckman, who decided such matters as the enforceability of the provision in the DRP requiring an Alabama-licensed arbitrator. *See* Ex. F.

Because the mass arbitration proceeding was dormant for months at the start and then stalled as a global mediation and motion practice proceeded, the arbitration process in this case was a far cry from the informal and speedy resolution of disputes envisioned by Congress in enacting the FAA. The mass arbitration proceeding slows the arbitration process, makes it more costly, and deprives the parties of their ability to select the decisionmakers in the arbitration.

C. **The Arbitrator Failed to Even Arguably Interpret the Parties' Arbitration Agreement.**

The Arbitrator actually selected by the parties did not consider or interpret the DRP as to whether the parties agreed to mass arbitration. The sole reasoning in the Process Arbitrator's Order that the Mass Arbitration Supplementary Rules apply was that the parties had incorporated the AAA Employment Arbitration Rules into their Arbitration Agreement and that the AAA had determined that the Mass Arbitration Supplementary Rules apply. Neither of those reasons provides a contractual basis for concluding that the party agreed to permit mass arbitration. While alluding to "the language of the DRP" as a basis for his decision, Lemons did not actually refer to

or construe any language in the DRP. As indicated in the Order, Lemons merely concluded that the parties automatically agreed to the Mass Arbitration Rules because they agree to the AAA Employment Arbitration Rules, even stating:

> To make the MA rules inapplicable, the individual employee and an appropriate company official would need to modify the Arbitration Agreement and the applicable DRP to provide that rules other than the AAA Employment Arbitration Rules would apply.

Ex. D, MA Order at 2 n.2. However, that reasoning does not comport with the Supreme Court jurisprudence, which provides that, absent an affirmative contractual basis, parties cannot be compelled to arbitrate under procedures that sacrifice the principal advantages of arbitration. *Concepcion*, 563 U.S. at 348; *Lamps Plus*, 587 U.S. at 184-5; *Epic*, 584 U.S. at 508; *Stolt-Nielsen*, 559 U.S. at 685.[10] In summary, because the Process Arbitrator did not even arguably construe the parties' Arbitration Agreement as providing a contractual basis for concluding that the parties agreed to permit mass arbitration, this Court should deny the Motion to Confirm.

**WHEREFORE**, PJ Cheese respectfully requests that this Court deny the Motion to Confirm, grant PJ Cheese's separately filed Motion to Vacate, and vacate the Arbitration Award under section 10(a)(4) of the FAA, and provide such other relief that is proper and just.[11]

---

[10] Process Arbitrator Lemon's reasoning can be contrasted with the arbitrator's construction of the contract's language in *Southern Communs. Servs., Inc. v. Thomas*, 720 F.3d 1352, 1360 (11th Cir. 2013), where the Eleventh Circuit upheld an arbitration award because the arbitrator had arguably construed the parties' contract by "[e]ngaging as he did with the contract's language and the parties' intent." Even though the agreement incorporated AAA rules, the arbitrator examined the text of the arbitration clause itself, parsed the meaning of the language, and interpreted the clause itself as not barring class arbitration, and thereupon the court found that "the arbitrator did not 'stray[] from his delegated task of interpreting a contract.'" *Id.* (quoting *Oxford Health*, 569 U.S. at 572). Alternatively, because the parties stipulated that the Mass Arbitration Supplementary Rules did not apply, the Process Arbitrator should not have compelled the parties to submit their dispute to mass arbitration. *Stolt-Nielsen*, 559 U.S. at 687.

[11] Alternatively, PJ Cheese respectfully requests that this Court modify or correct the Arbitration Award consistent with these arguments.

Dated:  July 9, 2026

Respectfully submitted,

*/s/ Robert Clayton Roesch*
Robert Clayton Roesch
Florida Bar No. 13931
SHUFFIELD, LOWMAN & WILSON, P.A.
1000 Legion Place, Suite 1700
Orlando, FL 32801
Telephone:  (407) 581-9800
Fax:  (407) 581-9801
croesch@shuffieldlowman.com
Attorneys for Respondent
PJ Cheese, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via

ECF to all counsel of record in this action.

*/s/ Robert Clayton Roesch*
Robert Clayton Roesch
Florida Bar No. 13931
SHUFFIELD, LOWMAN & WILSON, P.A.
1000 Legion Place, Suite 1700
Orlando, FL 32801
Telephone:  (407) 581-9800
Fax:  (407) 581-9801
croesch@shuffieldlowman.com
Attorneys for Respondent
PJ Cheese, Inc.